UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Application of Grains and Industrial Products Trading Pte Ltd and Bunge S.A. for an Order Directing Discovery from Daniel Rudolph Pursuant to 28 U.S.C. § 1782 | Misc. Action No. 7:19-mc-00006<br><br>***Ex Parte* Petition for Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782** |

Pursuant to 28 U.S.C. § 1782, Grains and Industrial Products Trading Pte Ltd ("GRIPT") and Bunge S.A. ("BSA") (collectively, "Petitioners") submit this Petition seeking an Order permitting them to issue a subpoena for the production of documents to Daniel Rudolph ("Rudolph") that will assist them in foreign legal proceedings pending in the courts of Singapore. A proposed form of the subpoena *duces tecum* is attached hereto as **Exhibit A**.

## I.    PETITIONERS' PURPOSE FOR SEEKING SECTION 1782 DISCOVERY

1.    Petitioners respectfully request that this Court issue an order permitting them to issue a subpoena for the production of documents to Rudolph who maintains an address in this judicial district at 101 Milton Road, Rye, NY 10580.  (Schlecker Decl. ¶ 4.)

2.    Petitioners require the requested discovery in connection with foreign legal proceedings that are currently pending in the courts of Singapore (the "Singapore Proceedings").

### A.    THE PARTIES IN THE SINGAPORE PROCEEDINGS

3.    The Plaintiffs in the Singapore Proceedings are Petitioners GRIPT and BSA. (*Id.* ¶ 8.)  GRIPT is a company incorporated in Singapore.  (*Id.*)  BSA is a company incorporated in Switzerland.  (*Id.*)

4.    GRIPT and BSA are both part of the Bunge group of companies ("Bunge"). (*Id.* ¶ 9.)    Bunge is a leading global agribusiness and food company that conducts a very broad

array of business activities and operations in agricultural commodities, agribusiness, edible oil products, milling products, bioenergy, oil, seeds and grains processing, and fertilizer. (*Id.*)

5.    The Defendants in the Singapore Proceedings are State Bank of India ("SBI"), Advantage Overseas Private Limited ("AOPL"), and Mr. Shrikant Bhasi ("Bhasi") (collectively, the "Singapore Defendants").  (*Id.* ¶ 10.)

6.    SBI is an Indian banking institution headquartered in India. (*Id.* ¶ 11.)  It is also duly licensed to operate in Singapore as a qualifying bank with a registered address at 134 Cecil Street, #01-00, MYP Plaza, Singapore 069536.  (*Id.*)

7.    AOPL is a company registered in India and was at all material times an Indian merchanting trader which conducted Indian merchanting trade transactions with foreign (i.e., offshore) counterparties such as GRIPT and BSA.  (*Id.* ¶ 12.)

8.    Bhasi was a former agent of Bunge's Financial Services Group ("FSG") and the Trade Structured Finance ("TSF") business line within FSG. (*Id.* ¶ 13.)  Insofar as the claims in the Singapore Proceedings are concerned, Bhasi's role as agent included originating and facilitating Indian merchanting trade transactions as well as dealings and relationships with counterparties in India, including but not limited to AOPL, for and on behalf of GRIPT and BSA.  (*Id.*)

**B.    SUMMARY OF PETITIONERS' CLAIMS IN THE SINGAPORE PROCEEDINGS**

9.    On April 26, 2018, Petitioners commenced the Singapore Proceedings by filing a Writ of Summons against SBI, AOPL, and Bhasi in the High Court of the Republic of Singapore. (*Id.* ¶ 14.)  Petitioners also filed an application for leave to serve originating process on AOPL and Bhasi outside of Singapore.  (*Id.*)  The application was supported by a first affidavit sworn by David Rigby ("Rigby"), the Senior Director of TSF, which is part of FSG within Bunge.  (*Id.*)

10.     On May 3, 2018, the High Court of the Republic of Singapore issued an order granting Petitioners leave to serve originating process on AOPL and Bhasi outside of Singapore. (*Id.* ¶ 15.)

11.     On June 13, 2018, Petitioners filed an application seeking, *inter alia*, leave to amend the Writ of Summons to add a claim by GRIPT against AOPL. (*Id.* ¶ 16.) On June 29, 2018, the High Court of the Republic of Singapore granted the application for leave to amend and Petitioners filed an amended Writ of Summons and an amended Statement of Claim (the "SOC").  (*Id.*)

12.     As set out in the SOC, Petitioners' claims against the Singapore Defendants arise in connection with Indian merchanting trade transactions involving, *inter alia*, the Petitioners and the Singapore Defendants.  (*Id.* ¶ 17.)  Petitioners' claims are briefly summarized below.

13.     First, GRIPT has asserted claims against AOPL and SBI for USD 50 million in connection with an Indian merchanting trade transaction that was entered into on or around September 14, 2015 (the "September 2015 Bunge-AOPL String Sale").  (*Id.* ¶ 18.)

14.     More specifically, GRIPT's claim against AOPL for USD 50 million arises under a sale and purchase contract between them dated September 14, 2015 as amended by an amendment agreement between them dated December 10, 2015 (the "AOPL/ GRIPT Contract"). (*Id.* ¶ 19.)  Pursuant to the AOPL/GRIPT Contract, AOPL was obliged to arrange for a letter of credit in the amount of USD 50 million to be issued in favor of GRIPT by December 15, 2015 (extended to February 29, 2016) or to pay the full amount of USD 50 million to GRIPT by December 15, 2015 (extended to February 29, 2016).  (*Id.*)  However, although GRIPT performed and AOPL has acknowledged that the USD 50 million is due under the AOPL/GRIPT Contract, AOPL has neither arranged for a letter of credit in the amount of USD 50 million to be

issued in favor of GRIPT nor paid the amount of USD 50 million or any part thereof to GRIPT. (*Id.*)

15.     GRIPT's claim against SBI for USD 50 million arises under irrevocable payment undertakings dated September 18, 2015 and December 15, 2015 (collectively, the "IPUs"), which were issued by SBI in connection with the September 2015 Bunge-AOPL String Sale. (*Id.* ¶ 20.) Pursuant to the IPUs, SBI irrevocably undertook that upon the receipt of export receivables in the amount of USD 50 million in the account of AOPL, the funds would be "earmarked" for payment to GRIPT under the AOPL/GRIPT Contract and it would either issue a letter of credit for USD 50 million in favor of GRIPT by December 15, 2015 (extended to February 29, 2016) or pay the full amount of USD 50 million to GRIPT no later than five business days after December 15, 2015 (extended to February 29, 2016). (*Id.*) However, although BSA paid the export receivables in the amount of USD 50 million into AOPL's bank account at SBI on September 18, 2018, SBI has neither issued a letter of credit for USD 50 million in favor of GRIPT nor paid the full amount of USD 50 million or any part thereof to GRIPT. (*Id.*)

16.     Second, Petitioners have asserted a claim against AOPL seeking a declaration of non-liability in respect of allegations made in a letter dated March 16, 2018, which was sent to BSA by Mr. Sujay Kantawala, an Indian advocate representing AOPL (the "Kantawala Letter"). (*Id.* ¶ 21.) Although the allegations and claims contained in the Kantawala Letter are vague and unparticularised, they are premised on the Indian merchanting trade transactions involving, *inter alia*, Petitioners and the Singapore Defendants. (*Id.*)

17.     More specifically, Petitioners' claim against AOPL for a declaration of non-liability arises in connection with allegations and claims made in the Kantawala Letter that

BSA gave assurances that it would continue to enter into Indian merchanting trade transactions with AOPL, BSA breached these assurances, and, as a result, AOPL has suffered losses and/or incurred liabilities in the amount of approximately USD 277 million.  (*Id.* ¶ 22.)  Petitioners have alleged that the Kantawala Letter is vague and unparticularised, they never gave the alleged assurances to AOPL, they were not subject to any legally enforceable obligation to continue to enter into Indian merchanting trade transactions with AOPL, and they are not liable for any losses suffered or liabilities incurred by AOPL. (*Id.*)  Accordingly, Petitioners are seeking a declaration of non-liability in respect of the allegations and claims made by AOPL in the Kantawala Letter.  (*Id.*.)

18.     Third, Petitioners have asserted claims against Bhasi for breaches of provisions in his agency agreements as well as breaches of his fiduciary duties.  (*Id.* ¶ 23.)  Pursuant to the agency agreements, Bhasi's role *vis-à-vis* Petitioners was, *inter alia*, to assist with the origination and arrangement of business deals in the Indian market, including the Indian merchanting trade transactions between Petitioners and various Indian counterparties, such as AOPL, which Bhasi introduced to Bunge.  (*Id.*)

19.     More specifically, Petitioners have asserted claims against Bhasi for breaching provisions in his agency agreements that prohibited him from being involved in any situations or engaged in any activities that create a conflict of interest between himself and Petitioners (collectively, the "No Conflict of Interest Terms") and also for breaching his fiduciary duties. (*Id.* ¶ 24.)  Petitioners have alleged that Bhasi breached the No Conflict of Interest Terms and his fiduciary duties because, at all material times since January 1, 2012, he held a beneficial interest in AOPL through a company named Asian Business Connections Private Limited ("ABC") and actively concealed the conflict from or, at a minimum, failed to disclose the conflict to and

obtain consent from Petitioners.  (*Id.*)  As a result, during the period between January 1, 2012 and November 8, 2017 (when the agency agreements were terminated), Bhasi acted concurrently as (i) the agent of Petitioners in their dealings with AOPL; and also as (ii) a director and a substantial shareholder of ABC, the Indian holding company of his Carnival group of companies (the "Carnival Group"), which owned almost 100% of the shares in AOPL.  (*Id.*)

20.     Petitioners have also asserted a claim against Bhasi for breaching provisions in the agency agreements that limited his authority to make final decisions that would bind Petitioners or otherwise enter into any contract or transaction in the name of Petitioners without first obtaining written approval (collectively, the "No Authority Terms").  (*Id.* ¶ 25.)  Petitioners have alleged that Bhasi would be in breach of the No Authority Terms to the extent that he gave assurances to AOPL without the consent, authority, and knowledge of Petitioners and that they will suffer losses and damages as a consequence, if and to the extent that they are found liable to AOPL for the claims set out in the Kantawala Letter.  (*Id.*)

21.     Petitioners have also asserted a claim against Bhasi pursuant to provisions in the agency agreements that require him to indemnify them from and against all actions, suits and proceedings and all cost, charges, expenses, loss or damages (direct or indirect) incurred or suffered by or caused to them by reason of his breaches of the agency agreements (collectively, the "Indemnity Terms").  (*Id.* ¶ 26.)  Petitioners have alleged that Bhasi should be required to indemnify Petitioners pursuant to the Indemnity Terms for any losses or damages they suffer in connection with the claims set out in the Kantawala Letter because any such losses or damages would have been caused by his breaches of the agency agreements.  (*Id.*)

### C.     THE WORLDWIDE MAREVA INJUNCTION

22.     On May 25, 2018, Petitioners filed an *ex parte* application seeking, *inter alia*, an injunction prohibiting Bhasi from disposing of his assets anywhere in the world up to a value of approximately USD 281 million.   (*Id.* ¶ 27.)   The application was supported by a third affidavit sworn by Rigby dated May 24, 2018 (the "Third Rigby Affidavit").  (*Id.*)

23.     On May 31, 2018, the Honourable Justice Hoo Sheau Peng of the High Court of the Republic of Singapore ("Justice Hoo") heard the application *ex parte* and, thereafter, issued an injunction prohibiting Bhasi from disposing of his assets anywhere in the world up to a value of approximately USD 280 million (the "Worldwide Mareva Injunction").  (*Id.* ¶ 28.)

24.     On June 28, 2018, Bhasi filed an application seeking, *inter alia*, to set aside the Worldwide Mareva Injunction.  (*Id.* ¶ 29.)   In support of his application, Bhasi filed various affidavits, including, *inter alia*, a second affidavit dated June 28, 2018 (the "Second Bhasi Affidavit") and a fourth affidavit dated July 27, 2018 (the "Fourth Bhasi Affidavit").  (*Id.*)

25.     Petitioners also filed various affidavits in opposition to Bhasi's application to set aside the Worldwide Mareva Injunction, including, *inter alia*, a sixth affidavit sworn by Rigby dated July 19, 2018 (the "Sixth Rigby Affidavit").  (*Id.* ¶ 30.)

26.     On August 1 and 2, 2018, Justice Hoo heard Bhasi's application to set aside the Worldwide Mareva Injunction and reserved judgment.   (*Id.* ¶ 31.)   On August 24, 2018, Justice Hoo issued a decision in favor of Bhasi setting aside the Worldwide Mareva Injunction (the "August 24, 2018 Decision").  (*Id.*)

27.     In the August 24, 2018 Decision, Justice Hoo stated that she was prepared to proceed on the basis that Petitioners had shown that there is a good arguable case against Bhasi "on the claims for breaches of contractual and fiduciary duties", "the indemnity claim" and also

on the issue of his "dishonesty".  (*Id.* ¶32.)  However, Justice Hoo determined that Petitioners

had not shown that there was a real risk of dissipation of assets because, *inter alia*, "[w]hile there

remains some dispute over [Bhasi's] involvement in the Atlantic Group, the alleged dishonest

dealings did not involve these entities."  (*Id.*)

### D.    THE SBI STAY APPLICATION

28.    On June 4, 2018, SBI filed an application seeking, *inter alia*, to stay the

Singapore Proceedings on the grounds that Singapore is not the proper forum for GRIPT's claim

against SBI (the "SBI Stay Application").  (*Id.* ¶ 33.)

29.    After SBI and Petitioners filed various affidavits in support of their

respective positions, Assistant Registrar Li Yuen Ting heard the SBI Stay Application on

August 15 and 24, 2018.  (*Id.* ¶ 34.)  Thereafter, on August 24, 2018, Assistant Registrar Li Yuen

Ting issued a decision dismissing the SBI Stay Application.  (*Id.*)

30.    On September 5, 2018, SBI filed a notice of appeal against the decision

dismissing the SBI Stay Application (the "SBI Appeal"). (*Id.* ¶ 35.)  Thereafter, SBI filed various

further affidavits in support of the SBI Appeal, including, *inter alia*, a first affidavit sworn by

Saurabh Srivastava dated October 24, 2018 (the "First Srivastava Affidavit").  (*Id.*)

31.    Petitioners also filed various further affidavits in opposition to the SBI Appeal,

including, *inter alia*, a third affidavit sworn by Tan Jwee Peng Calvin dated November 2, 2018

(the "Third Tan Affidavit").  (*Id.* ¶ 36.)

32.    On November 12, 2018, Justice Hoo heard the SBI Appeal.  (*Id.* ¶ 37.)

Justice Hoo has reserved judgment and is expected to issue a decision in January 2019.  (*Id.*)

### E.        THE AOPL AND BHASI DISCHARGE AND STAY APPLICATION

33.      On July 13, 2018, AOPL and Bhasi filed an application seeking, *inter alia*, to discharge the order granting Petitioners leave to serve originating process on AOPL and Bhasi outside of Singapore or, alternatively, to stay the Singapore Proceedings on the grounds that Singapore is not the proper forum (the "AOPL and Bhasi Discharge and Stay Application"). (*Id.* ¶ 38.)

34.      In support of their application, AOPL and Bhasi have filed various affidavits, including, *inter alia,* a third affidavit sworn by Bhasi dated July 13, 2018 (the "Third Bhasi Affidavit") and a second affidavit sworn by Maneesh Kumar Singh, the Managing Director of AOPL, dated October 4, 2018 (the "Second Singh Affidavit"). (*Id.* ¶ 39.)

35.      Petitioners have also filed various affidavits in opposition to the AOPL and Bhasi Discharge and Stay Application, including, *inter alia*, a seventh affidavit sworn by Rigby dated August 21, 2018 (the "Seventh Rigby Affidavit") and an eighth affidavit sworn by Rigby dated August 21, 2018 (the "Eighth Rigby Affidavit").  (*Id.* ¶ 40.)

36.      Among other things, Petitioners have noted that the AOPL and Bhasi Discharge and Stay Application itself is a breach of the AOPL/ GRIPT Contract, the vast majority of the contracts between AOPL and GRIPT in relation to other Indian merchanting trade transactions and the operative agency agreements, all of which are expressly governed by Singapore law and provide for the jurisdiction of the courts of Singapore.  (*Id.* ¶ 41.)

37.      During a hearing on November 23, 2018, Justice Hoo directed AOPL and Bhasi to file any final and responsive affidavits by January 4, 2019 and scheduled a hearing on the AOPL and Bhasi Discharge and Stay Application for January 28 and 29, 2019.  (*Id.* ¶ 42.)

F.     **LEAVE TO APPEAL THE DECISION SETTING ASIDE THE WORLDWIDE MAREVA INJUNCTION**

38.     On August 31, 2018, Petitioners filed an application for leave to appeal the August 24, 2018 Decision setting aside the Worldwide Mareva Injunction on the grounds that Justice Hoo erred in finding that they had not shown a real risk of dissipation of assets by Bhasi. (*Id.* ¶ 43.)

39.     In support of their application for leave to appeal, Petitioners relied, *inter alia*, on new factual evidence which AOPL and SBI disclosed for the first time in October 2018. (*Id.* ¶ 44.)   Specifically, AOPL and SBI revealed for the first time that the USD 50 million, which was supposed to be "earmarked" in AOPL's account at SBI for payment to GRIPT under the AOPL/GRIPT Contract and the IPUs, was in fact paid to Atlantic Industrial & Trading Pte Ltd ("Atlantic Industrial"). (*Id*.)   SBI has alleged that it paid the USD 50 million to Atlantic Industrial pursuant to instructions from AOPL which were confirmed orally in a telephone call by either Trupti Jadhav ("Trupti") or Sunil Ambujakshan ("Sunil") acting as Bunge's representatives.  (*Id.*)

40.     Petitioners' have explained that SBI's account of alleged events is totally implausible for a number of reasons. (*Id.* ¶ 45.)  Among other reasons, Petitioners have explained that neither Trupti nor Sunil were employed by GRIPT; rather, they both were employed by Bunge India Private Limited ("BIPL") and later by Bunge India Trading Private Limited ("BITPL").  (*Id.*)  Accordingly, neither Trupti nor Sunil would have authority to act on behalf of GRIPT to release SBI from its obligations to GRIPT under the IPUs. (*Id.*)   Moreover, the allegation that either Trupti or Sunil gave the alleged oral consent is suspect given Trupti now works for Carnival Movies International Pte Ltd ("Carnival Movies"), which affiliated with AOPL through Bhasi's Carnival Group, and Sunil now works for AOPL (*Id.)*

41.     In light of the foregoing, Petitioners have argued that the new factual evidence establishes that the USD 50 million was wrongfully diverted to Atlantic Industrial and that Justice Hoo erred in finding that "the alleged dishonest dealings did not involve these entities." (*Id.* ¶ 46.)

42.     On November 20, 2018, Justice Hoo heard Petitioners' application for leave to appeal the August 24, 2018 Decision setting aside the Worldwide Mareva Injunction. (*Id.* ¶ 47.)

43.     On November 23, 2018, Justice Hoo granted Petitioners' application for leave to appeal the August 24, 2018 Decision to the Court of Appeal of the Republic of Singapore. (*Id.* ¶ 48.)

44.     On December 21, 2018, Petitioners filed an application in the Court of Appeal of the Republic of Singapore seeking, *inter alia*, leave to adduce further evidence for the appeal and an expedited schedule.  (*Id.* ¶ 49.)  The hearing on Petitioners' appeal of the August 24, 2018 Decision setting aside the Worldwide Mareva Injunction is expected to take place sometime in 2019. (*Id.*)

## G.     DOCUMENTS IN THE POSSESSION, CUSTODY, AND CONTROL OF DANIEL RUDOLPH

45.     As set forth below, upon information and belief, Daniel Rudolph is in possession, custody, and control of discrete categories of documents relating to the ownership and financial affairs of and/or the true relationships between and among Bhasi, ABC, AOPL, Carnival Movies, Atlantic Resources   Trading   Pte   Ltd   ("Atlantic Resources"),   Atlantic   Industrial,   and Daniel Amarilla ("Amarilla").  (*Id.* ¶ 6.)

46.     Rudolph was employed by Bunge from March 2001 until he resigned to take early retirement in March 2015.  (*Id.* ¶ 50.)  During this period, Rudolph was employed initially as a

Director of TSF and then ultimately as the head of FSG.  (*Id.*)  During his employment with Bunge, Rudolph was first based in Geneva and then relocated to the US in September 2006.  (*Id.*)

47.     In his role at Bunge, Rudolph worked closely with Bhasi in relation to the India business.  (*Id.* ¶ 51.) Indeed, Bhasi has alleged that "Rudolph (the head of FSG) . . . proposed the idea of dealing with a friendly counterparty in the Bunge Merchanting Trade transactions" and that "[i]t was in this context that [Bhasi] proposed that Bunge Group could deal with AOPL."  (*Id.*)  Bhasi has also alleged that "Rudolph, at one point, held shares in ABC" and that it is "pertinent that at this time, AOPL shares had already been transferred to ABC."  (*Id.*) Based on the foregoing, Bhasi has alleged that "the relevant witnesses involved in this dispute" include "Daniel Rudolph." (*Id.*)

48.     During the course of their investigation of the claims against Bhasi and AOPL, Petitioners have discovered that Rudolph did, in fact, hold an approximately 26.27% interest in ABC until around May 30, 2013 when it appears that he sold his interest in ABC to Bhasi. (*Id.* ¶ 52.)  Petitioners have noted that it is odd that Rudolph would have held such an interest at a time when ABC owned AOPL, which was a counterparty with which Bunge was conducting Indian merchanting trade transactions and with which Bhasi was purportedly negotiating as agent on behalf of Bunge.  (*Id.*)

49.     Notwithstanding the foregoing, the fact that Rudolph held an interest in ABC at this time means that he is likely to have relevant evidence regarding Bhasi's interests in ABC and AOPL as well as the Agreement of Share Transfer dated January 4, 2012 pursuant to which ABC acquired shares of AOPL.  (*Id.* ¶ 53.)  Such evidence is relevant to the Singapore Proceedings because Bhasi has sought to rely on the Agreement of Share Transfer to argue that,

notwithstanding the fact that he owns almost 100% of ABC, which, in turn, owns almost 100% of AOPL, neither he nor ABC actually owns any beneficial interest in AOPL.  (*Id.*)

50.    Petitioners have also recently discovered that Rudolph continues to own interests in other companies connected to Bhasi and his Carnival Group, including Carnival Movies and Atlantic Resources.  (*Id.* ¶ 54.)  Specifically, since July 18, 2013 and June 15, 2016, Rudolph has held an approximately 8.26% interest in Carnival Movies and an approximately 0.27% interest in Atlantic Resources, respectively.  (*Id.*.)    Significantly, the remaining interests in Carnival Movies and Atlantic Resources are held by Bhasi and Petitioners have alleged that these entities are connected to ABC, AOPL, and Atlantic Industrial, which is the company to which the USD 50 million was allegedly paid.  (*Id.*)

51.    In light of his ownership interest in Carnival Movies, Rudolph is likely to have relevant evidence regarding the numerous related party transactions or "intra-group" loans between and among ABC, AOPL, and entities in the Carnival Group including Carnival Movies. (*Id.* ¶ 55.)  Such evidence is relevant in the Singapore Proceedings because Petitioners have alleged that these related party transactions or "intra-group" loans establish that Bhasi and ABC are, in fact, the beneficial owners of AOPL and also that there is a real risk of dissipation of assets by Bhasi.  (*Id.*)

52.    Rudolph may also have relevant evidence regarding the circumstances surrounding the alleged payment of USD 50 million to Atlantic Industrial. (*Id.* ¶ 56.)   That is so because Trupti, a former employee of BIPL and BITPL who is alleged by SBI to have authorized the release of the earmarked USD 50 million to Atlantic Industrial, now appears to be employed by Carnival Movies.  (*Id.*)   Such evidence is relevant to the Singapore Proceedings because GRIPT has asserted claims against AOPL and SBI for the USD 50 million that was allegedly

paid to Atlantic Industrial and Petitioners have also argued that the payment of the USD 50 million to Atlantic Industrial supports their position that there is a real risk of dissipation of assets by Bhasi.  (*Id.*)

53.     In light of his ownership interests in Carnival Movies and Atlantic Resources, Rudolph is also likely to have relevant evidence regarding the true nature of the relationship between and among these entities and Atlantic Industrial.  (*Id.* ¶ 57.)  In this regard, Petitioners have alleged that all three entities are part of Bhasi's complex corporate web based on the fact that they all share the same registered address in Singapore and there are substantial overlapping interests and directorships held by Bhasi, Rudolph, and Amarilla, another former employee of Bunge who is allegedly the sole shareholder and CEO of Atlantic Industrial. (*Id.*)  Bhasi has acknowledged that Amarilla founded Atlantic Resources, that Atlantic Resources and Atlantic Industrial share office space pursuant to a services agreement, and that Amarilla was previously a shareholder and director of Carnival Movies. (*Id.*)  However, he has nonetheless argued that neither Atlantic Resources nor Atlantic Industrial is part of his Carnival Group and also that he has no involvement with Atlantic Industrial.  (*Id.*)  Accordingly, evidence from Rudolph regarding the true nature of the relationship between and among Atlantic Resources, Carnival Movies, and Atlantic Industrial will be relevant to GRIPT's claims against AOPL and SBI for the USD 50 million that was allegedly paid to Atlantic Industrial, Petitioners' claims against Bhasi for breaches of his agency agreements and his fiduciary duties, and the issue of whether there is a real risk of dissipation of assets by Bhasi.  (*Id.*)

54.     In addition to his role at Bunge, his relationship with Bhasi, and his interests in companies connected to Bhasi and his Carnival Group, Rudolph has also participated directly in negotiations between and among Bunge, AOPL, and Bhasi and his Carnival Group regarding the

payment of the USD 50 million owed to GRIPT.  (*Id.* ¶ 58.)    In particular, Rudolph attended a meeting in June 2017 at the Grant Hyatt hotel in midtown New York during which he, Bhasi, and, Matthew Carter, the current head of Bunge's FSG, discussed repayment of the outstanding USD 50 million owed by AOPL to GRIPT and Bhasi made a proposal which involved using assets of the Carnival Group (the "Midtown Meeting").  (*Id.*)

55.     In light of the fact that he attended and participated in the Midtown Meeting, Rudolph is likely to have relevant evidence regarding the circumstances surrounding Bhasi's proposal to use assets of the Carnival Group to satisfy a debt owed by AOPL to GRIPT. (*Id.* ¶ 59.) Such evidence is relevant to the Singapore Proceedings because Petitioners have alleged that Bhasi's willingness to use assets of the Carnival Group to satisfy a debt owed by AOPL to GRIPT establishes that Bhasi and ABC are, in fact, the beneficial owners of AOPL. (*Id.*)  By contrast, Bhasi has alleged that he "was simply trying to come forward and help Bunge salvage the situation."  (*Id.*)  Accordingly, evidence from Rudolph regarding the circumstances surrounding Bhasi's proposal to use assets of the Carnival Group to satisfy a debt owed by AOPL to GRIPT will be relevant to Petitioners' claims against Bhasi for breaches of his agency agreements and his fiduciary duties.  (*Id.*)

## II.    THE REQUIREMENTS OF SECTION 1782 ARE SATISFIED

56.     "Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004).  The statute provides, in relevant part, that:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or

international tribunal or upon the application of any interested person . . . . To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

U.S.C. § 1782(a).

57.     Accordingly, a district court is authorized to grant a Section 1782 petition and order discovery if three requirements are met: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012); *see also In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 128 (2d Cir. 2017); *In re Esses*, 101 F.3d 873, 875 (2d Cir. 1996).  Here, all three of the statutory requirements are satisfied.

58.     First, Rudolph "resides" or "is found" in this judicial district because he maintains an address in this judicial district at 101 Milton Road, Rye, NY 10580.  (Schlecker Decl. ¶ 4.)

59.     Second, the documents sought by Petitioners are "for use" in the proceedings pending before the courts of Singapore.  (*Id.* ¶ 5.)  Specifically, the requested documents will be used by Petitioners to support their arguments that (i) Bhasi and ABC, which is the Indian holding company of Bhasi's Carnival Group, are the beneficial owners of AOPL; (ii) ABC, AOPL, Carnival Movies, Atlantic Resources, and Atlantic Industrial are all part of Bhasi's complex corporate web; and (iii) SBI, AOPL, and Bhasi have wrongfully diverted USD 50 million from GRIPT and BSA to Atlantic Industrial.  (*Id.*)

60.     Third, each of the Petitioners is an "interested person" because each of them is a plaintiff in the proceedings pending before the courts of Singapore.  (*Id.* ¶ 8.)

61.     Accordingly, all three of the statutory requirements are satisfied.

### III.     THE *INTEL* FACTORS WEIGH IN FAVOR OF GRANTING THE PETITION

62.     The Supreme Court has identified four discretionary factors that a district court must consider when ruling on a § 1782 application: (i) whether "the person from whom discovery is sought is a participant in the foreign proceeding"; (ii) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign . . . court or agency abroad to U.S. federal-court judicial assistance"; (iii) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions"; and (iv) whether the request is "unduly intrusive or burdensome." *Intel*, 542 U.S at 264-65; *see also In re Catalyst Managerial Servs., DMCC*, 680 F. App'x 37, 38 (2d Cir. 2017) (summary order); *In re Application of Accent Delight Int'l Ltd.*, No. 16-MC-125 (JMF), 2016 WL 5818597, at *1 (S.D.N.Y. Oct. 5, 2016), *aff'd sub nom. In re Accent Delight Int'l Ltd.*, 869 F.3d 121 (2d Cir. 2017), *and aff'd sub nom. In re Accent Delight Int'l Ltd.*, 696 F. App'x 537 (2d Cir. 2017). Here, all four of the *Intel* discretionary factors weigh in favor of granting the Petition.

63.     First, Rudolph is not a party to the Singapore Proceedings.  Schlecker Decl. ¶ 6; c*f. Intel*, 542 U.S. at 264 ("[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . ., the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.")

64.     Second, there is no indication, or reason to believe, that the courts of Singapore would be unreceptive to U.S. federal-court judicial assistance by way of Section 1782 discovery. (*Id.* ¶ 7.)

65.     Third, this request does not seek to, and does not have the effect of, circumventing any foreign proof-gathering restrictions or other policies.  (*Id.*)

66.     Finally, this request is not unduly burdensome or intrusive.  It seeks discrete categories of documents in the possession, custody, and control of Rudolph.  Furthermore, Rudolph, the recipient of the subpoena, will have all of his rights protected under Rule 45 of the Federal Rules of Civil Procedure.

67.     Accordingly, all four of the *Intel* discretionary factors weigh in favor of granting the Petition.

## CONCLUSION

WHEREFORE, because the Petition complies with the requirements of 28 U.S.C. § 1782 and the discretionary factors weigh in favor of it being granted, Petitioners respectfully move the Court to issue the attached order granting the Petition, authorizing the issuance of the subpoena in the form attached hereto as Exhibit A, and authorizing Petitioners to issue additional subpoenas for the production of documents and/or depositions of Rudolph as Petitioners reasonably deem appropriate and as is consistent with the Federal Rules of Civil Procedure.


Dated: January 2, 2019
       New York, New York

                                        Respectfully submitted,

                                        **REED SMITH LLP**

                                        By:     /s/ David M. Schlecker
                                                David M. Schlecker
                                                Jonathan P. Gordon
                                                599 Lexington Avenue
                                                New York, New York 10022
                                                Telephone:  (212) 521-5400

                                        *Attorneys for Petitioners Grains and Industrial*
                                        *Products Trading Pte Ltd and Bunge S.A.*